**NEW YORK LIFE INS. CO. v. EDWARDS, Collector of Internal Revenue.**

(District Court, S. D. New York. December 19, 1924.)

1. Internal revenue ☞7—Mutual insurance company held not entitled to exclude from income overpayments of premiums awaiting application to deferred dividend policies.

Under Revenue Act 1913, § 2, G (a), (b), overpayments of premiums ascertained to have been made in previous years on deferred dividend policies, which had not reached maturity during taxable year, not returned to policy holders nor deducted from premiums paid during year, but set apart to await apportionment on such policies, cannot be excluded from mutual insurance company's income for year.

2. Internal revenue ☞7—Repayment to insurance company of advances to agents previously written off as losses held "capital gains" and not "income."

Repayment to insurance company of commissions advanced to agents, and written off as losses prior to enactment of Act Aug. 5, 1909, c. 6, § 38, should be treated as "capital gains," and not "income," taxable under Revenue Act 1913, since no benefits had accrued from their deduction.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Income.]

3. Internal revenue ☞7—Amortization of securities purchased at premium based on actual purchase price held allowable deduction from income.

Amortization based on actual purchase price of securities purchased by insurance company at premium, to distinguish payment back of portion of capital investment from actual yield, was allowable deduction from income, under Revenue Act 1913, § 2, G (a), (b).

4. Trusts ☞274(4)—Trustee, purchasing bonds at premium for life tenant and remainderman, must amortize premiums to keep capital intact.

Trustee for life tenant and remainderman, purchasing bonds at premium, must reserve from income sufficient sums to amortize premiums paid, so that capital may be kept intact.

5. Internal revenue ☞7—Additions to reserves for future premium losses, unreported losses, and annuities to agents held deductible from income.

Additions by insurance company to reserves to meet possible losses of future premiums under disability clauses, losses not yet reported, and life annuities to agents as permitted by state laws, were deductible from income under Revenue Act 1913, § 2, G (a), (b); any adjustment in reserves required by actual losses, etc., to be reflected in subsequent income statements.

At Law. Action by the New York Life Insurance Company against William H. Edwards, Collector of Internal Revenue for the Second Internal Revenue District of the State of New York. Judgment for plaintiff.

James H. McIntosh, of New York City, for plaintiff.

William Hayward, U. S. Atty., of New York City (Thomas J. Crawford, Asst. U. S. Atty., of New York City, and Forest D. Siefkin, Sp. Atty., Bureau of Internal Revenue, of Chicago, Ill., of counsel), for defendant.

MACK, Circuit Judge. The plaintiff, a mutual life insurance company organized under the laws of the state of New York and operated on the mutual level premium plan, sues to recover the sum of $89,705.33, alleged to have been erroneously assessed

and collected for the year 1913, under the provision of section 2, G (a) (b), of the Revenue Act of 1913, 38 Stat. 114, 172, 173, the pertinent portions of which appear in the footnote.[1] The principal facts have been stipulated.

[1] 1. The plaintiff contends that $81,899.18 of the amount of tax in question was erroneously assessed by reason of the fact that the Commissioner of Internal Revenue

---

[1] "That the normal tax hereinbefore imposed upon individuals likewise shall be levied, assessed, and paid annually upon the entire net income arising or accruing from all sources during the preceding calendar year to every corporation, joint-stock company or association, and every insurance company, organized in the United States, no matter how created or organized, not including partnerships. * * *

"Such net income shall be ascertained by deducting from the gross amount of the income of such corporation, joint-stock company or association, or insurance company, received within the year from all sources, (first) all the ordinary and necessary expenses paid within the year in the maintenance and operation of its business and properties, including rentals or other payments required to be made as a condition to the continued use or possession of property; (second) all losses actually sustained within the year and not compensated by insurance or otherwise, including a reasonable allowance for depreciation by use, wear and tear óf property, if any; and in the case of mines a reasonable allowance for depletion of ores and all other natural deposits, not to exceed 5 per centum of the gross value at the mine of the output for the year for which the computation is made; *and in case of insurance companies the net addition, if any, required by law to be made within the year to reserve funds and the sums other than dividends paid within the year on policy and annuity contracts:* Provided, that mutual fire insurance companies requiring their members to make premium deposits to provide for losses and expenses shall not return as income any portion of the premium deposits returned to their policyholders, but shall return as taxable income all income received by them from all other sources plus such portions of the premium deposits as are retained by the companies for purposes other than the payment of losses and expenses and reinsurance reserves: Provided further, that mutual marine insurance companies shall include in their return of gross income gross premiums collected and received by them less amounts paid for reinsurance, but shall be entitled to include in deductions from gross income amounts repaid to policyholders on account of premiums previously paid by them and interest paid upon such amounts between the ascertainment thereof and the payment thereof and *life insurance companies shall not include as income in any year such portion of any actual premium received from any individual policyholder as shall have been paid back or credited to such individual policyholder, or treated as an abatement of premium of such individual policyholder, within such year.*"

---

refused to permit the plaintiff to exclude or deduct from its income the sum of $8,189,918, which plaintiff had ascertained to be the amount of overpayments of premiums made during the year 1912 by the plaintiff's deferred dividend policy holders. By a mathematical calculation plaintiff had ascertained the amount of overpayments made by each deferred dividend policy holder on each $1,000 of insurance for each year of issue on each insurance plan and at each age of issue. This rate of overpayment per $1,000 of insurance for each year of issue on each insurance plan and at each age of issue was recorded on a special sheet for each policy holder, and these sheets were bound together, each year of issue in a separate volume. Plaintiff did not actually calculate from the rate of overpayments thus shown in respect of each policy the amount of overpayment made by any individual deferred dividend policy holder, nor did it refund any of these overpayments to its policy holders during the year 1913. All the overpayments in question were made in respect of deferred dividend policies which had not reached maturity during the year 1913. What the plaintiff did was to carry the overpayments in an account designated in its annual report to the state insurance department as "amount set apart, apportioned, provisionally ascertained, calculated, declared or held awaiting apportionment upon deferred dividend policies."

Under the plaintiff's deferred dividend policy, as is customary with that kind of policy, no dividend is allowed or paid to the insured until the completion of the distribution period stated in the policy and unless the policy shall be in force at such time. The policy provided that, upon the completion of the distribution period, the surplus or profits derived from such deferred dividend policies as may be permitted by their respective holders to lapse shall be apportioned among such deferred dividend policy holders whose policies are then in force; that is, a holder of a deferred dividend policy may lose by forfeiting to the other members of his class the annually ascertained overpayments of premium made by such holder, either by permitting his policy to lapse or by dying before the completion of the accumulation period stated in his policy. On the other hand, the holder who survives the distribution period and keeps up his policy receives the annually ascertained overpayments of premiums with accumulated interest and his proportionate share of the overpayments, with interest,

made by holders of the same class who did not survive or who permitted their policies to lapse. The company as such and its policy holders not in the same class gain nothing by such lapses or forfeitures.

The sum of $8,819,918, which the plaintiff contends should be deducted from its income for the year 1913, represents the total amount of the overpayment of premiums calculated by it to have been made by its deferred policy holders in the year 1912. There is, we believe, nothing in the record to show which deferred policy holders, if any, of those making the overpayments in 1912, paid premiums to the plaintiff in the year 1913.

In Penn Mutual Life Insurance Co. v. Lederer, 252 U. S. 523, 40 S. Ct. 397, 64 L. Ed. 698, the Supreme Court held that money derived by a mutual company from redundancy of premiums in previous years, and paid to policy holders during the tax year as dividends in cash, not applied in abatement or reduction of their current premiums, could not be deducted from premium receipts in computing gross income. Mr. Justice Brandeis analyzed the apparent purpose of Congress in enacting the provisions of the Revenue Act of 1913 in question, reviewed the history of section 2, G (b) of that act, and explained the reasons that may have actuated and justified Congress in providing a different rule for the treatment of redundant premiums in the three different classes of mutual insurance recognized by the act, to wit, mutual fire, mutual marine, and mutual life insurance. In answering the argument that the nature of life insurance dividends is the same, whatever the disposition made of them, and that Congress could not have intended to relieve the companies from taxation to the extent that dividends are applied in payment of premiums and to tax them to the extent that dividends are not so applied, Mr. Justice Brandeis stated (pages 530–533 [40 S. Ct. 399]):

"If Congress is to be assumed to have intended, in obedience to the demands of consistency, that all dividends declared under life insurance policies should be treated alike in connection with income taxation regardless of their disposition, the rule of consistency would require deductions more far-reaching than those now claimed by the company. Why allow so-called noninclusion of amounts equal to the dividends paid in cash but not applied in reduction of renewal premium and disallow so-called noninclusion of amounts equal to the dividends paid by a credit representing amounts retained by the company for accumulation or to be otherwise used for the policy holders' benefit? The fact is that Congress has acted with entire consistency in laying down the rule by which in computing gross earnings certain amounts only are excluded; but the company has failed to recognize what the principle is which Congress has consistently applied. The principle applied is that of basing the taxation on receipts of net premiums, instead of on gross premiums. The amount equal to the aggregate of certain dividends is excluded, although they are dividends, because by reason of their application the net premium receipts of the tax are to that extent less. There is a striking difference between an aggregate of individual premiums, each reduced by means of dividends, and an aggregate of full premiums, from which it is sought to deduct amounts paid out by the company which have no relation whatever to premiums received within the tax year but which relate to some other premiums which may have been received many years earlier. The difference between the two cases is such as may well have seemed to Congress sufficient to justify the application of different rules of taxation.

"There is also a further significant difference. All life insurance has in it the element of protection. That afforded by fraternal beneficiary societies, as originally devised, had in it only the element of protection. There the premiums paid by the member were supposed to be sufficient, and only sufficient, to pay the losses which will fall during the current year, just as premiums in fire, marine, or casualty insurance are supposed to cover only the losses of the year or other term for which the insurance is written. Fraternal life insurance has been exempted from all income taxation; Congress having differentiated these societies, in this respect as it had in others, from ordinary life insurance companies. Compare Supreme Council of the Royal Arcanum v. Behrend, 247 U. S. 394. But in level premium life insurance, while the motive for taking it may be mainly protection, the business is largely that of savings investment. The premium is in the nature of a savings deposit. Except where there are stockholders, the savings bank pays back to the depositor his deposit with the interest earned less the necessary expense of management. The insurance company does the same, the difference being merely that the savings bank undertakes to repay to each individual depositor the whole of his deposit with interest; while the life insurance com-

pany undertakes to pay to each member of a class the average amount (regarding the chances of life and death), so that those who do not reach the average age get more than they have deposited—that is, paid in premiums (including interest)—and those who exceed the average age less than they deposited (including interest). The dividend of a life insurance company may be regarded as paying back part of these deposits called premiums. The dividend is made possible because the amounts paid in as premium have earned more that it was assumed they would when the policy contract was made, or because the expense of conducting the business was less than it was then assumed it would be or because the mortality—that is, the deaths in the class to which the policy holder belongs—proved to be less than had then been assumed in fixing the premium rate. When for any or all of these reasons the net cost of the investment (that is, the right to receive at death or at the endowment date the agreed sum) has proved to be less than that for which provision was made, the difference may be regarded either as profit on the investment or as a saving in the expense of the protection. When the dividend is applied in reduction of the renewal premium, Congress might well regard the element of protection as predominant and treat the reduction of the premium paid by means of a dividend as merely a lessening of the expense of protection. But after the policy is paid up the element of investment predominates, and Congress might reasonably regard the dividend substantially as profit on the investment.

"The dividends aggregating $686,503, which the Penn Mutual Company insists should have been 'noninincluded,' or more properly deducted, from the gross income, were, in part, dividends on the ordinary limited payment life policies which had been paid up. There are others which arose under policy contracts in which the investment feature is more striking; for instance, the accelerative endowment policy, or such special form of contract as the 25-year '6 per cent. investment bond' matured and paid March, 1913, on which the policy holder received, besides dividends, interest and a 'share of forfeitures.' In the latter, as in 'deferred dividend' and other semitontine policies, the dividend represents in part what clearly could not be regarded as a repayment of excess premium of the policy holder receiving the dividend; for the 'share of the forfeiture' which he receives is the share of the redundancy in premium of oth-

er policy holders who did not persist in premium payments to the end of the contract period."

If the company may not deduct from its income actual cash returns made to deferred dividend policy holders on account of the redundancy of the premiums, it would seem to follow that the company should not be permitted to exclude from its income for the year the ascertained overpayments of premiums for the previous year or years, when in the year in question neither was cash returned to the policy holders nor was any abatement or reduction made in the premiums paid by such policy holders during the year. If the actual cash return of the redundancy of the premiums as such may not be deducted by the company, then a bookkeeping entry, which at best is but the equivalent of setting aside a fund to meet such cash returns to be made in the future, would seem to be entitled to no more favorable consideration.

It is argued that this interpretation of the Revenue Act of 1913 places a much heavier burden of taxation upon the interest of the deferred dividend policy holders than upon the annual dividend policy holders, whose share in the redundancy of premiums, or, more accurately, the redundancy of whose individual premiums is determined and paid annually either in cash or by way of abatement of current premiums. But it should be pointed out that the dividends on the annual dividend policies are not deducted as dividends, but only by reason of the fact that the company is, under the Revenue Act of 1919, entitled to exclude from its income such portion of any premium received from any individual policy holder as may have been paid back or credited to such individual within the year. If during the year no premium were received from the individual policy holder from which the dividend could be deducted, the dividend, it seems, would not be excluded in calculating the income of the company.

To repeat, as the Supreme Court pointed out in Penn Mutual Life Insurance Co. v. Lederer, supra, the act of 1913 does not permit the deduction of dividends; it provides merely that the company need not include as income such portion of any premium received in any year as shall have been paid back or credited any individual policy holder within that year. Whether and to what extent dividends which have become payable on deferred dividend policies may be deducted from premiums payable by such individual policy holder it is not necessary

now to decide. If the burden of taxation under the Revenue Act of 1913, as interpreted by the highest court, should be considered to bear more heavily upon the deferred dividend policy holders than the annual dividend policy holders, that is an argument which may properly be addressed to the legislative branch.

[2] 2. Plaintiff further contends that $283.10 of the tax in question was erroneously assessed, because the Commissioner of Internal Revenue refused to permit the plaintiff to deduct from its gross income commissions in the amount of $28,309.97 advanced to agents prior to 1906 (in which year the making of further advances was prohibited by the state of New York), and repaid or recovered in the year 1913. It appears from the stipulation that these advances had, subsequent to 1906 and prior to January, 1913, been charged off by the company as losses. Inasmuch as, under the uncontradicted testimony, it appears that these debts had been written off prior to the enactment of the Act of August 5, 1909, c. 6, § 38, 36 Stat. 112, imposing a special excise tax upon corporations, including insurance companies, and that no benefit in respect of any deductions for losses on account of these debts had been retained under any federal tax law, the plaintiff should not be obliged to treat the amount of the repayment of these doubtful loans as income, merely because it had prudently omitted some of its questionable assets from its balance sheet. Though a taxpayer cannot, while retaining the benefits accruing from the deduction of its bad debts in previous years, disclaim the burdens resulting from the inclusion of the samewhat unexpected repayment of these bad debts in subsequent years, yet if, as in this case, no such benefits have accrued, such repayments are properly to be treated as capital gains, and not income.

[3] 3. It is a further contention of plaintiff that the Commissioner of Internal Revenue erroneously refused to permit the plaintiff to deduct from its gross income the sum of $332,466.22, representing the amortization of the securities purchased by the plaintiff at a premium. The amortization was based on the actual purchase price, and mathematically computed in and from the books of the plaintiff; it was not a revaluation of the securities to conform to market prices. Such amortization was not allowed as a deduction, under the act of 1909, by the Circuit Court of Appeals for the Seventh Circuit, in Fink & Northwestern Mutual Life Insurance Co.,

267 F. 968, on the ground that no loss had been actually ascertained, and that such amortization could not be regarded as depreciation, which, within the meaning of that act, had reference only to the wear and tear and obsolescence of property, and did not even cover the depletion of mining property. Von Baumbach v. Sargent Land Co., 242 U. S. 524, 37 S. Ct. 201, 61 L. Ed. 460.

The government contends that the language of the act of 1913 on depreciation is even narrower than that of the act of 1909, except where express qualifications have been made, as in the case of mines. In New York Life Insurance Co. v. Anderson, 263 F. 527, the Circuit Court of Appeals for this Circuit permitted the insurance company to revalue its securities in accordance with the prevailing market prices, and to deduct the loss as depreciation under the act of 1909. The government's position is that the latter decision is not in accord with the views expressed by the Supreme Court, and, whether right or wrong under the act of 1909, which permitted "a reasonable allowance for depreciation of property," would not hold under the act of 1913, which permitted such allowance only "for depreciation by use, wear and tear of property." It has already been pointed out, however, that the amortization in question is not a revaluation to reflect market changes. It is a computation to distinguish the payment back of a portion of a capital investment from the interest or yield. It need not be assimilated to depreciation at all.

[4] In computing the return or income from bonds purchased at a premium, as a matter of economics an allowance must be made from the nominal interest paid to permit the amortization of the premium of maturity. In fact, a trustee for a life tenant and a remainderman is obligated, if he purchases bonds at a premium, to reserve from the income accruing to the life tenant sufficient sums to amortize the premiums paid so that the capital may be kept intact. In re Stevens, 187 N. Y. 471, 80 N. E. 358, 12 L. R. A. (N. S.) 814, 10 Ann. Cas. 511; McLouth v. Hunt, 154 N. Y. 179, 48 N. E. 548, 39 L. R. A. 230. If, in accordance with sound business and accounting methods, the plaintiff has consistently distinguished between the yield of its investments and the amortization of its capital, I think that the Commissioner of Internal Revenue erroneously treated the amounts amortized as income.

[5] 4. The Commissioner of Internal Revenue also refused to allow the following items to be included in "the net addition, if any, required to be made within the year [1913] to reserve funds," which the law permits the plaintiff to deduct from its net income:

(a) $16,629 to meet the losses of future premiums under policies, waiving the right of the company to such premiums if the insured should become totally and permanently disabled.

(b) $250,000 to meet plaintiff's liability on losses which occurred in the year 1913, but which had not yet been reported.

(c) $160,641 to meet the plaintiff's obligations under so-called "Nylic" contracts of employment with its soliciting agents, which entitled the agents, after 20 years of service, with certain prescribed minimum results, to an annuity for life, payable monthly.

All these so-called reserves were kept in accordance with the requirements of the insurance laws of the state of New York. It is, however, contended by the government that they are not reserves required by law within the meaning of the act of 1913. But in Maryland Casualty Co. v. U. S., 251 U. S. 342, 40 S. Ct. 155, 64 L. Ed. 297, the Supreme Court stated:

"The term 'reserve' or 'reserves' has a special meaning in the law of insurance. While its scope varies under different laws, in general it means a sum of money, variously computed or estimated, which with accretions from interest, is set aside, 'reserved,' as a fund with which to mature or liquidate, either by payment or reinsurance with other companies, future unaccrued and contingent claims, and claims accrued, but contingent and indefinite as to amount or time of payment. In this case, as we have seen, the term includes 'unearned premium reserve' to meet future liabilities on policies, 'liability reserve' to satisfy claims, indefinte in amount and as to time of payment, but accrued on liability and workmen's compensation policies, and 'reserve for loss claims' accrued on policies other than those provided for in the 'liability reserve,' but it has nowhere been held that 'reserve,' in this technical sense, must be maintained to provide for the ordinary running expenses of a business, definite in amount and which must be currently paid by every company from its income if its business is to continue, such as taxes, salaries, reinsurance, and unpaid brokerage."

It seems to me that, within the rules then laid down by the Supreme Court, the addi-

tion to these so-called reserves were properly deductible from the plaintiff's gross income. It is pointed out that a different rule as to unpaid losses is set forth in McCoach v. Insurance Co. of North America, 244 U. S. 585, 37 S. Ct. 709, 61 L. Ed. 1333, and Fink v. Northwestern Mutual Life Insurance Co., supra. The decisions of the Supreme Court do appear conflicting, and until the conflict is resolved I follow the most recent ruling. This rule, too, seems to me to be in accord with sound accounting practice and the requirements of state law. The only serious question, it seems to me, arises in regard to the reserve for unpaid or unreported losses. It is said that these are already covered by the general reserve. While this may be true in a sense, I think it more truly reflects the position of the company to permit it to estimate all payments that may have to be made on account of losses during the year, whether reported or not. If an adjustment of the general reserves becomes necessary, this may be reflected in subsequent income statements of the company.

It is questionable, in my mind, moreover, whether, admitting that double reserves are required by state law as a matter of abundant precaution, such reserves are not recognized by the Revenue Act.