**HAMILTON MFG. CO. v. WILKINSON, Collector of Internal Revenue.**

District Court, E. D. Wisconsin. December 22, 1926.

**1. Internal revenue ⬳9(25)—Loss or depreciation of property, deductible from income, may be established by any competent proofs (Excise Law 1909, § 38).**

·Under Excise Law 1909 (36 Stat. 112) § 38, permitting deduction from gross income of "all losses actually sustained within the year, * * * including a reasonable allowance for depreciation of property," loss or depreciation on account of property purchased, to be availa-

ble as a deduction, need not necessarily await a resale before it is "sustained," nor can such a limit be imposed by administrative rule, but it may be established by any proofs which competently support both the fact and degree of such loss.

**2. Internal revenue ⬳9(27)—Transfer by the collector of an income deduction allowed a taxpayer in a prior year to another year within the "pre-war period," with the effect of increasing its war profits tax, held unwarranted (Revenue Act 1918, §§ 301, 310, 311, 320 [Comp. St. §§ 6336⁷⁄₁₆aa, 6336⁷⁄₁₆d, 6336⁷⁄₁₆e, 6336⁷⁄₁₆g]).**

Plaintiff corporation in 1909 purchased the property and assets of a competing company, paying admittedly more than the market value and a bonus in addition for the purpose of ending a long and expensive litigation. In 1910 it claimed and was allowed a deduction from income under Excise Act 1909 (36 Stat. 112) § 38, for loss on account of such purchase, based on an inventory at market value and the bonus paid. In 1912 it sold the property and sustained further loss, which it claimed and was allowed as a deduction for that year. *Held* that, in computing its war profits tax for 1918, under Revenue Act 1918, §§ 301, 310, 311, 320 (Comp. St. §§ 6336⁷⁄₁₆aa, 6336⁷⁄₁₆d, 6336⁷⁄₁₆e, 6336⁷⁄₁₆g) the collector was without power to attribute the loss on account of such purchase, which was claimed and allowed in 1910, to the year 1912, thus reducing plaintiff's average "pre-war income," which included the years 1911, 1912, and 1913, and was deductible, and increasing its war profits tax.

**3. Internal revenue ⬳9(27)—Collector held without power to reopen and readjust settled accounts with taxpayer to affect its liability under subsequent statute (Revenue Act 1918, § 320 [Comp. St. § 6336⁷⁄₁₆g]).**

In determining the average net income of a corporation for the "pre-war period" (years 1911, 1912, and 1913) to be credited in computing war profits taxes, under Revenue Act 1918, § 320 (Comp. St. § 6336⁷⁄₁₆g), the collector is without power to reopen settled and approved accounts of the corporation for prior years, and to readjust the same for the purpose of enlarging its liability for war profits tax.

At Law. Action by the Hamilton Manufacturing Company against A. H. Wilkinson, Collector of Internal Revenue. Judgment for plaintiff.

The plaintiff seeks to recover a tax paid upon an assessment under the 1918 "war profits" tax law (Comp. St. §§ 6336⁷⁄₁₆a–6336⁷⁄₁₆p). In 1909, and for some years prior thereto, plaintiff and a Michigan corporation, the Tubbs Manufacturing Company, had engaged in long, expensive litigation concerning patents and unfair competition, and in that year settled their differences. The plaintiff paid approximately $164,000 to the Tubbs Company to cover items hereinafter referred to. At the close

of the following year the plaintiff charged off on its books as a loss, on account of the Tubbs venture, $60,000. That amount was recognized by the government as a loss, and was deducted from an income of the plaintiff in admeasuring the excise tax payable under the corporation excise tax law of 1909 (36 Stat. 112). In 1912 the plaintiff sold the physical properties received in the Tubbs venture, excepting such as had been theretofore used in its own manufacturing purposes. At that time, when cast over against the $164,000, the plaintiff found that, in addition to the $60,000 loss charged off in 1910, there was approximately $16,000 more. No question arose until the plaintiff made its returns under the 1918 act, under which it was entitled to a credit against its "war profits" of a sum called the "prewar income," ascertained by averaging the taxable incomes returnable under the 1909 excise law for the years 1911, 1912, and 1913. The government insisted upon carrying into the 1912 income as an entire loss sustained in the year 1912, the total of $76,000, being the $60,000 charged off in 1910 and the $16,000 additional found in 1912. The collector of internal revenue sustained this contention, and as a result the "prewar" income, when averaged, was lower, and the taxable war profits higher. Other facts are stated in the opinion.

Nash & Nash, of Manitowoc, Wis., and Miller, Mack & Fairchild, of Milwaukee, Wis., for plaintiff.

Levi H. Bancroft, Asst. U. S. Atty., of Milwaukee, Wis., for defendant.

GEIGER, District Judge. I shall give my reasons for the conclusion that the plaintiff must prevail. That the plaintiff suffered a loss on the Tubbs venture is not controverted; nor, when the elements making up the consideration paid by it are considered, can there be any doubt that, in 1909, when the transaction was consummated, and certainly in 1910, the plaintiff justifiably felt that it had sustained a loss, and attempted in good faith to then value what it had received upon the transaction, and thereby to assess its loss, or at least a part of it.

[1] Now, considering the 1909 excise law, I am unwilling to accept the collector's broad proposition that "losses," to be available as deductions against the incomes here under review, can never be recognized, unless determined by the fact of sale of property claimed to be the subject of loss. The cases cited in support of this proposition, and claimed to be particularly pertinent under this 1909 excise law, fall far short thereof. In my judgment the Von Baumbach Case, 242 U. S. 524, 37 S. Ct. 201, 61 L. Ed. 460, like other cases dealing with reduction of capital assets by conversion, likewise the Fink Case (C. C. A.) 267 F. 968, and New York Life Insurance Co. v. Edwards (April 19, 1926) 271 U. S. 109, 46 S. Ct. 436, 70 L. Ed. 859, dealing with additions to amortization funds, do not support the broad proposition that losses can be evidenced solely by casting a sales price, as here, against a prior purchase price as the only determiner of "values." Indeed, the Fink Case in its reference to Conn. General Life Ins. Co. v. Eaton (D. C.) 218 F. 188, indicates clearly, as does also the Edwards Case, that the objection to treating additions to an amortization fund as "losses" arises inherently because of the failure to take cognizance of actual value, and thereby of actual loss, *as either otherwise may be determined or determinable*. These cases do not hold that, where an insurance company, or any one else subject to a tax law, has purchased bonds at 110, if, for five years they have steadily depreciated to and remained at 50, the owner is precluded from claiming or establishing a loss in the sense of the law.

On the other hand, if mere additions to an amortization fund, regardless of "value" of (and therefore possible "loss" upon) the amortized security, be recognized, we should have the absurd possibility of claiming "loss" on securities purchased at a premium which at the time of the addition to the amortization fund *had advanced in fact to a greater premium*. And on a further consideration of the adjudicated cases it may be said: New York Life Ins. Co. v. Anderson (D. C.) 262 F. 215, dealt directly with the right, if not the duty, of a taxpayer (under the excise tax act) to value his property with a view of ascertaining "losses," or, in any event, with a view of determining the deductibility of any sum by way of answer to the question which, as the Circuit Court of Appeals for the Second Circuit (263 F. 529) states it, "is not strictly whether depreciation in market value is a loss, but whether, when Congress specifically includes within 'losses actually sustained within the year * * * a reasonable allowance for depreciation of property,' depreciation does not become a loss, no matter what persons other than Congress may think of the subject." And the court added: "We have no doubt that this loss in market value is depreciation. The word means, by derivation and common usage, a 'fall in value;'

reduction of worth,' and it seems to us to require mention only to prove that the average citizen, for whom statutes are assumed to be made, would judge depreciation of his own bonds by the opinion of the public, however thoroughly convinced of the ultimate wisdom of holding onto what had depreciated."

In N. Y. Life Ins. Co. v. Edwards (D. C.) 3 F.(2d) 280, instead of presenting the contention recognized in the Anderson Case respecting the revaluation right for the determination of losses, the plaintiff limited itself to the contention "that the Commissioner of Internal Revenue erroneously refused to permit the plaintiff to deduct from its gross income the sum of $332,466.22, representing the amortization of the securities purchased by the plaintiff at a premium. The amortization was based on the actual purchase price, and mathematically computed in and from the books of the plaintiff; *it was not a revaluation of the securities to conform to market prices.* Such amortization was not allowed as a deduction, under the act of 1909, by the Circuit Court of Appeals for the Seventh Circuit, in Fink v. Northwestern Mutual Life Insurance Co., 267 F. 968, on the ground that no loss had been actually ascertained, and that such amortization could not be regarded as depreciation, which, within the meaning of that act, had reference only to the wear and tear and obsolescence of property, and did not even cover the depletion of mining property" (citing Von Baumbach Case, supra).

The trial court further states and deals with the contentions thus:

"The government contends that the language of the act of 1913 (38 Stat. 114) on depreciation is even narrower than that of the act of 1909, except where express qualifications have been made, as in the case of mines. In New York Life Insurance Co. v. Anderson, 263 F. 527, the Circuit Court of Appeals for this circuit permitted the insurance company to revalue its securities in accordance with the prevailing market prices, and to deduct the loss as depreciation under the act of 1909. The government's position is that the latter decision is not in accord with the views expressed by the Supreme Court, and, whether right or wrong under the act of 1909, which permitted 'a reasonable allowance for depreciation of property,' would not hold under the act of 1913, which permitted such allowance only 'for depreciation by use, wear and tear of property.' It has already been pointed out, however, that the amortization in question

is not a revaluation to reflect market changes. It is a computation to distinguish the payment back of a portion of a capital investment from the interest or yield. It need not be assimilated to depreciation at all.

"In computing the return or income from bonds purchased at a premium, as a matter of economics an allowance must be made from the nominal interest paid to permit the amortization of the premium of [at] maturity. In fact, a trustee for a life tenant and a remainderman is obligated, if he purchases bonds at a premium, to reserve from the income accruing to the life tenant sufficient sums to amortize the premiums paid so that the capital may be kept intact [citing cases]. If, in accordance with sound business and accounting methods, the plaintiff has consistently distinguished between the yield of its investments and the amortization of its capital, I think that the Commissioner of Internal Revenue erroneously treated the amounts amortized as income."

The Circuit Court of Appeals, in considering the foregoing (8 F.[2d] 858), apparently saw not the slightest occasion for disturbing its ruling in the Anderson Case, supra, but clearly based its reversal (of the Edwards Case) specifically upon the nonapplicability of the doctrine of the Anderson Case to a situation disclosing claims for deduction supported merely by computed amortization, and it says:

"But the language of the act of 1913, which is the statute herein involved, differs somewhat from that which governed the Anderson Case. It provides that net income is to be ascertained by deducting, * * * second, all losses actually sustained within the year and not compensated by insurance or otherwise, including a reasonable allowance for depreciation by use, wear and tear of property, if any.' The act of 1913 thous restricts the 'reasonable allowance for depreciation' to depreciation 'by use, wear and tear.' We do not think the depreciation of securities, which had not been sold during the year, comes under the clause relating to 'depreciation by use, wear and tear'; neither do we think that it is 'a loss actually sustained' during the year. In our opinion the court was in error in its holding upon this subject."

The Supreme Court on certiorari in this Edwards Case, 271 U. S. 109, 46 S. Ct. 436, 70 L. Ed. 859, disposed of this phase thus: "The company owned money, bonds, etc., payable at future dates, purchased at prices above their par values, and to amortize these

premiums a fund was set up. It claimed that an addition to this fund should be deducted from gross receipts. The District Court thought the claim well founded, but the Circuit Court of Appeals took another view. Unless the addition amounted to a loss 'actually sustained within the year,' no deduction could be made therefor. Obviously no actual ascertainable loss had occurred. All of the securities might have been sold thereafter above cost. The result of the venture could not be known until they were either sold or paid off."

So, after all, the Edwards Case came before each of the three courts with no basis for substantiating either depreciation or loss of any character save through and by proof of establishing and maintaining amortization funds to which annual additions were made. Upon such a record and without further proof the Supreme Court, in dealing with the evidentiary character of such a fund to substantiate either depreciation or loss, might well say that no ascertainable, or ascertained, "loss" had occurred; that all the securities might have been sold thereafter *above* cost; but it was not required to, nor in my judgment could it, say upon such a record that "the result of the venture could not be known until they were either sold or paid off." Clearly, nothing in the law as it stood when the transactions in question in the present case occurred placed any limitation upon resort to well-known methods or manner of ascertaining either "depreciation" or "loss."

To recur to the illustration hereinbefore given, it is fair to ask, what in the law or in the light of good sense should preclude a taxpayer from showing that a bond purchased five years before the taxing year at $110 had fallen upon the market to 50 by reason of the financial embarrassment of a railroad company issuing the same, that it had remained at approximately 50 for three years, and that with a railroad company in the hands of receivers interest had been defaulted with no reasonable basis for forecast of a betterment of conditions; hence that he has sustained certainly a depreciation, if not a loss—a "loss" or "depreciation" under the act of 1909, clearly attributable to something other than wear, tear, or use of physical properties? The Edwards, when set over against the Anderson Case, strikes me as presenting no question save the narrow one, viz. whether either depreciation or loss could ever be shown merely by the practice, and in the particular case the fact and amount of amortization additions. As pre-

viously indicated, if the existence of an amortization fund and its annual accretions prove "losses sustained," we might have the absurd spectacle of enabling the taxpayer to prove "losses" during the year on securities which not only had not been sold, but, being retained, in fact enjoyed (in the particular year) a substantial increment in "value" as that term is used. Therefore the broad observations found in the discussion of the case in the Supreme Court (271 U. S. 116, 46 S. Ct. 436, 70 L. Ed. 859) should not be taken as enunciating a rule respecting an *exclusive* manner of ascertaining loss.

Stating it in another way, suppose in the Edwards Case, instead of mere proof of the amortization fund, plaintiff, as in the Anderson Case, had made proof by reference to markets, etc., of actual and substantial depreciation or losses, could the court, under the act of 1909 (not 1913) have reached the conclusion that such substantial differences could not, in the eyes of the law, be treated as depreciation or a real "loss" *ascertained,* as always ascertainable in many other situations, where "valuation" is determined upon a range of pertinent and available proofs, all with the view of finding, for example, capital impairment or "loss"? Surely, if one of plaintiff's shareholders had challenged the Tubbs transaction as a capital waste, and he supported his representations of inadequate consideration or extravagant "value" by proofs, ordinarily available, would it be responsive that "value" therefore waste or "loss"—could be established only by or through *another actual sale?* Indeed, waste or loss might be most inescapably proved by establishing *unsalability* at the *invested* or the *cost price* that was paid.

To say, justifiably, that increment in value of property representing capital is not "income received" by no means arouses, as antithetical, the proposition that "depreciation," "fall in worth," of like property may not or cannot exhibit *capital* "depreciation" or *capital* "loss sustained," even though the property be not sold. Selling may be a more accurate way of admeasuring the *degree* of depreciation or loss, but it is not and cannot be the *sole method,* either of determining the fact nor its degree or scope. In other words, "income received" and "losses sustained" are not fundamentally antithetical, any more than are "income received" and "depreciation." If on the one side of property representing invested capital we place increment or appreciation in "value," and also "earnings" or "income" derived therefrom, as those terms are com-

monly understood, then "depreciation" in "value," or what is claimed as a "loss," while opposed to "appreciation" or "increment," is not, definitively nor in common understanding, opposed to "earnings" or "income."

When, therefore, courts, in considering either probative competency or probative value of amortization or accrual of discount practice, reason that because increment in value according to computation of accrual of discount is not proof of income, or further that amortization of premiums obediently to a system of computation is not proof of "loss or depreciation"—because in each of these cases actual values, as they may be determined, are disregarded—such courts conclude merely that neither income on the one side, nor loss or depreciation on the other, is *thereby* respectively established.

We recur now to a consideration of the cases insistently pressed as binding the court to reject the plaintiff's contention respecting its right to pursue the method attempted in its endeavors to establish "depreciation" or "loss" on the Tubbs transaction, *sustained at the time* it claims it was or they were sustained. Thus, as illustrative of the acceptance of its contention that the Edwards, the Fink, and not the Anderson Case, supra, rule here, and that other courts so hold, counsel for the government urge Lumber Ins. Co. v. Malley, Collector, quoting from Judge Dodge's opinion ([D. C.] 256 F. 384):

"I am unable to believe, either that *such* increases *in book values* can become income *received* within the year, or that their *excess* over *such decreases* can be *income received* within the year, in the sense of the second clause of section 38 of the act here in question [the Excise Act of 1909]. Nor can I believe that *such decreases* in value are either *expenses* paid in maintenance and operation, or *losses sustained* within the year, including depreciation of property, in the sense of said clause. As I have held in No. 653 [decided by him and presenting another question—256 F. 380], the act contemplates an estimation of income and of deductions therefrom upon a 'cash,' as opposed to a 'revenue,' basis, except where the language used distinctly indicates otherwise. In my opinion, appreciation in value of securities thus held does not become income until it is received by realization. If such appreciation *cannot increase income* for the purposes of the act, there is no ground for allowing *such depreciation to decrease the remaining* income. The depreciation *here in question* is not *claimed* to be a 'reasonable allowance* for *depreciation of property,'* and therefore a deduction to which the plaintiff is entitled." (Italics supplied.)

Let us see to what sort of a case the foregoing observations are addressed. Judge Dodge states it:

"The plaintiff claims $142.95, being the tax paid by it on $14,294.61, added by the Commissioner to the amount of income from all sources other than premiums included by it in returning its gross income. On the plaintiff's books this appeared as the *net increase in value* of bonds held by it as investments of its funds; the *gross* increase appearing as $14,884.83, offset by a *gross* decrease in value of $590.22. Said increase and decrease were *calculated* by the plaintiff *according to an 'amortization' plan,* adopted by it for the first time in 1911. On bonds which had cost it less than par the *book value* was to be *proportionally increased in each year,* so as to amount to par at maturity; and on bonds for which a premium had been paid there was to be a *proportionate decrease* in *book* value, so that they should stand at par *at maturity* said increase or decrease were in *no case* based *upon any sale* or disposal of any of the bonds involved." (Italics supplied.)

Plainly, upon such a case the observations pressed as authoritative deal solely with the efficacy of a plan of computations to *prove value;* and, as I shall indicate in further reference to the Fink and Edwards Cases, such probative efficacy was denied. Why? Because the plan does not deal with the *realities of value* upon which a determination either of "depreciation" or "loss" must turn. In any event, whatever the merit in that part of the opinion which deals with estimation of income upon a "cash" as opposed to a "revenue" basis, I doubt its soundness when dealing with "deductions" permitted in respect of "losses" or "depreciation" to be determined (in some way) as "reasonable allowances." But the discussion is none the less interesting, when reflected against the views expressed by the trial court in the Edwards Case (D. C.) 3 F.(2d) 284 (excerpt supra), where apparently it was sought to reconcile the doctrine of the Anderson Case (C. C. A.) 263 F. 527, to "amortization" theory and practice. And although the judge observed that "the amortization in question is *not a revaluation* to reflect *market changes.* It is a *computation* to *distinguish* the payment back of a portion of a capital investment from the interest or yield. It *need not be* assimilated to *depreciation* at all" (see excerpt supra);

(italics supplied), he proceeded to justify the practice "as a matter of economics," and as a matter of law upon the analogy of treatment of income by trustees as between life tenant-and remainderman; concluding that "if, in accordance with sound *business* and *accounting methods,* the plaintiff has *consistently distinguished* between the *yield of its investments* and the *amortization* of its capital,. I think that the Commissioner of Internal Revenue *erroneously treated* the *amounts amortized* as income." (Italics supplied.)

It should be borne in mind that, notwithstanding the concluding phrase above, the insurance company was insisting upon its right to "deduct from its gross income the sum of * * * representing the amortization of the securities purchased by the plaintiff at a premium," which amortization "was based on the actual purchase price, and mathematically computed *in* and *from the books* * * *; it was not a *revaluation* * * * to *conform* to *market prices."* (Italics supplied.) The latter is evidence of "value."

Now, very obviously, as it seems to me, the trial court thus. came to a conclusion identical with that of the trial (this) court in the Fink Case, supra, though in the latter the matter seems not to be the subject of elaboration, but was specially considered in the appellate court. When, therefore, upon review of this particular question, the views and judgments of the trial courts in these cases, respectively, were expressly disapproved, the appellate courts of the two circuits came into harmony, not upon a repudiation of the *Anderson* Case and its fundamental doctrine, but upon rejecting the *theory, the plan, and the practice* of amortization as affording *competent, probative support* of "value," thereby to establish claimed deductions for *either* "depreciation" or "loss."

The Edwards Case, as noted, was reviewed by the Supreme Court on certiorari. 271 U. S. 109, 46 S. Ct. 436, 70 L. Ed. 859. And if, notwithstanding the simple statement of the particular question by that court (above quoted, see page 116 of report [46 S. Ct. 437]), there is still doubt respecting the scope of possible determination, it may be dispelled by observing that counsel for the insurance company, in that court, made no pretension except for *right* to support deductions by amortization results, and in challenging the judgment of the Second Circuit appellate court cited the Fink Case to support his contention that "no *authoritative* decision has been made on this sub-ject by the federal courts" (page 112 [46 S. Ct. 436]). True, the proposition was somewhat variantly phrased—no doubt with the idea of conforming it to the objective; i. e., the *legal* efficacy of the proof. It is pressed in this language: That "on securities purchased at a premium there was an *intrinsic change* in the value * * * each year, which was perfectly susceptible of *calculation,* and the aggregate sum shown by the petitioner's return was the *true amount* of the intrinsic *change* and *actual loss* on securities purchased at a premium." (Italics supplied.)

No difficulty attends recognition of the Anderson Case as dealing with subject-matter clearly differentiated from that submitted for consideration in either the *Fink* or the Edwards Case in any of the courts, and this necessitates the view that in the latter the courts did not, because upon the records they could not, deal with the fundamental doctrine of the former (the Anderson Case) which plaintiff invokes in the present case.

It is true that the trial court in the Anderson Case, while discussing the question of depreciation and loss (see 262 F. 215) and denying the interpretability of the statute as claimed on behalf of the insurance company, none the less considered and overruled the action of the Commissioner in allowing "the plaintiff to charge off, * * * which was the amount of amortization necessary to bring down the *book value* of certain of its bonds to *their market value."* I cannot believe that the word "amortization" was here used in its technical sense, but in the sense of "reducing" as a means of "valuing" in accordance with realities of the market. It is true that the trial court considered something in the nature of "book adjustments" for increasing or decreasing the book value of certain bonds in order to adjust the accruals of discounts and to amortize the premiums at which it had purchased them. But the Circuit Court of Appeals stated the question thus:

"Plaintiff complains: (1) That the court answered in the negative the following question: When such securities as stocks and bonds are the property of such a taxpayer as the plaintiff, much of whose business consists in dealing in and owning the same, is the amount of their market depreciation during the taxing year that 'reasonable allowance for depreciation of property' which the statute authorizes as a deduction?" See 263 F. 528.

Thus far it may be conceded that, limiting ourselves to adjudicated cases brought

to the attention of the court, the plaintiff rests its contentions largely upon the Anderson Case, whereas the defendant relies first upon the Edwards and the Fink Cases, all differentiated clearly from the Anderson Case, and the Von Baumbach and other cases which present wholly different considerations; i. e., capital depletion as a result of conversion. As indicated, the Edwards and Fink and all cases dealing with amortization may be eliminated upon what are conceived to be, perhaps narrow, but entirely clear, grounds hereinbefore discussed, and still leave open the fundamental question respecting the meaning of the clause contained in the 1909 act (36 Stat. 112, § 38), viz. permitting as deductions: "All losses actually sustained within the year and not compensated by insurance or otherwise, including a reasonable allowance for depreciation of property, if any."

[2] Whether "depreciation in market value" is a "loss" is stated in the Anderson Case not to be "strictly the question," but rather whether, "when Congress specifically *includes* within 'losses actually sustained within the year * * * a reasonable allowance for depreciation of property,' depreciation does not become a loss," is conceived to be the question, "no matter what persons other than Congress may think on the subject." So that, even if the Anderson Case be treated as limited strictly to statutory interpretation, the plaintiff in the present case may still urge that upon the admitted facts and proofs it sustained a "loss" in 1909 or 1910, upon the Tubbs purchase or venture. On behalf of the defendant the propositions are thus stated:

"No deduction could be taken for losses sustained or reduction in value of the Tubbs property until sale or other disposal of the property."

"A loss is not sustained by a reduction in value or in book value, but only when the asset has been disposed of."

"Depreciation means annual losses for wear and tear and obsolescence of structures, machinery, and personalty in use in business, and not reduction in value."

When, therefore, the Edwards, Fink, and other cases are limited, as hereinbefore indicated, the principle of the Anderson Case may still be invoked by the plaintiff in this case even though in the Anderson Case it was narrowly contended that the fall in market value of bonds was deductible as a species of "loss," within the meaning of a statute placing "a reasonable allowance for depreciation of property" within the category of losses. And the plaintiff may well contend here that as an original proposition there is nothing in the language of the 1909 statute which precludes an analysis of the facts in this case for the purpose of establishing a loss within the meaning of that statute, just as the fact of such a "loss" could have been established at that time (1909 or 1910), if for any other purpose determination of "values" was necessitated, in order to determine capital losses or impairment.

But, passing for the present any attempt to state comprehensively a principle that may be applicable, we will endeavor to summarize the facts as they are conceded, or as they should be found, upon which the plaintiff bases its claim. They are:

Plaintiff's business was started more than 40 years ago, and was conducted at Two Rivers, Wis., as a manufacturer of wood type printers' furniture and the like. In 1904 the Tubbs Manufacturing Company, a corporation several of whose organizers were formerly employees of the plaintiff, built a factory at Ludington, Mich. It very soon began to use patents, trade-names, designs, drawings, catalogues, and several machines belonging to or perfected and used by the plaintiff, through and after many years of effort and money expenditure. Actions to restrain infringement and unfair competition were started by the plaintiff, and after pending several years, at great expense and heavy loss to both parties, a settlement was agreed to in or about July, 1909. The terms of such settlement included the discontinuance of litigation, the trial court decrees in the litigation to stand, the plaintiff purchased the Tubbs Company's property, and the latter company went out of business.

The cash consideration to be paid by the plaintiff to the Tubbs Company covered three ingredients: (1) The plant, machinery, etc., at book value; (2) all other property, exclusive of book accounts and certain specified completed stock, at an appraisal to be made pursuant to the agreement; (3) 30 per cent. additional cast upon the sums of (1) and (2).

This was carried out in the following manner:

| | |
|---|---|
| The plant, etc. (No. 1) was fixed at | $ 88,500.00 |
| All other property (No. 2) | 38,400.00 |
| Thirty per cent. (No. 3) | 38,070.00 |
| Total cash consideration to be paid | $164,970.00 |

The agreed statement herein contains the following:

"(6) For the sake of determining the

litigation and assuring itself against possible heavy losses in the future in case the litigation turned out unfavorable, and to acquire the business of the Tubbs Company, the plaintiff paid for the property of the Tubbs Company a price in excess of its value, although the price so paid was not enough to enable the stockholders of the Tubbs Company to get back the full amount of their investment. These stockholders also took some loss as a condition of terminating the litigation.

"(7) Inventory value of the property of the Tubbs Company (hereinafter called the 'Tubbs property'), at the date of settlement above described, was at $126,900. This amount in fact was, and was recognized by the plaintiff, to be in excess of the actual value of the property, but the plaintiff paid that amount plus 30 per cent., or $38,070, additional, because the plaintiff believed it was worth this excess, plus the $38,070, to it to acquire the business of the Tubbs Company and to get rid of dangerous litigation, involving the validity of its patents and the imitation of its goods, catalogues, and designs."

"(10) Ever since the plaintiff's incorporation, plaintiff followed the usual business custom of revaluing its business (not including real estate or good will) assets once in each year. This revaluation or inventory taking occurred on or about the end of December in each year.

"(11) Before the end of the year following plaintiff's purchase of the Tubbs property (that is, before the end of the year 1910) the plaintiff decided that it desired to write off as a loss the $38,070 which it had paid in excess of inventory value for the Tubbs property, and plaintiff further decided that, in its inventory based upon its annual revaluation of business assets, it would take some substantial additional loss on account of what it considered loss of market value in what was purchased from the Tubbs Company; and plaintiff, after careful examination of the facts and situation, believed that the loss of market value on said Tubbs property (including said $38,070) was at least $60,000. Therefore, in closing its books for 1910, plaintiff charged off as a loss or depreciation, on account of the Tubbs property purchased the preceding year, the total sum of $60,000, which was inclusive of the sum of $38,070 paid in excess of inventory value. This $60,000 so written off by the plaintiff was deducted from its income of 1910.

"(12) All entries in the books of the corporation, taking a loss or depreciation of $60,000, on account of the Tubbs property, were made at the close of the year 1910, after the amount to be deducted had been determined by the plaintiff, and in the regular course of business.

"(13) The Tubbs property was sold by the plaintiff in 1912 at an aggregate sum of $76,968.48 less than the price the plaintiff had paid therefor, and causing a loss of $16,968.48 in addition to the amount of $60,000 that the plaintiff had charged off in 1910. * * *"

To the foregoing agreement should be added proof of certain other facts submitted upon the present trial, dealing in greater detail with the relations subsisting between the two companies and the character of much of the Tubbs inventory property, when its "book" value was considered in the light of the physical conditions—the testimony clearly supporting the view that the "book" value was far in excess of any fair or market value obtainable consequent upon the condition of the property. The testimony of particular importance, however, is that dealing with the facts and circumstances inducing the payment of 30 per cent. in addition to the consideration to be fixed for the inventory property as negativing, as a hypothesis reasonably to be entertained, that such sum was considered reasonably to admeasure the value of the good will or intangibles. Indeed, it is hard to believe that in the light of the litigation pending, dealing with patent infringement and unfair competition, piracy of catalogues, designs, drawings, etc., the plaintiff could pay this amount, except as a consideration to rid itself of the Tubbs Company and its *ill*, rather than to acquire its *good*, will. The proofs sustain rather clearly the view that this element of the consideration was a disbursement, and, if a disbursement, a part of what the witness characterizes as "the price of peace."

Upon closing the transaction or venture with the Tubbs Company, plaintiff entered it upon its books, as "Tubbs Purchase Account, $164,970," or substantially so. Now, addressing ourselves to this item, representing, as it did, *on paper*, the exact fact of a capital disbursement—$164,970—how shall we answer the question, Did the plaintiff at *that* time, or at any time prior to December, 1910, receive and hold, in a true and just sense, a countervailing capital asset, property, or consideration of the capital *value*, dollar for dollar, in the same sum? Obviously, upon (1) the concession that it paid

in "excess of the actual value when it paid $126,900 for the property, and (2) the fact, if not fairly conceded, here unhesitatingly found, that the 30 per cent. additional ($38,-700) brought in no "property" to be considered as having value, this question must have a prompt negative answer. Indeed, the position of the defendant hardly gainsays this, for his proposition is, not that the loss had not *occurred,* but merely that it is not "sustained," in a legal sense unless, or until, it can be admeasured in one and only way, viz. by another sale of the property upon which the admitted "loss" occurred—no matter that the loss to some degree occurred coincidentally with original purchase; i. e., by purchase at a price admittedly in excess of "value"; no matter that loss in some degree thereafter, and because of impossibility of resale (because of lack of "value") *at the original purchase price,* had admittedly occurred.

Counsel seems wholly to overlook the dominant character of many of these statutes dealing with income, in that, by their enumerations of the ingredients on either side of a business account, they are in a large part purely declaratory; that when the statute here under consideration included among deductions "losses actually sustained during the year," it declared a right cognizable without the statute. In any event, if the right were wholly statutory, it was not left to administrative power nor grace to define it; and when it included in such "losses" a "reasonable allowance for depreciation of property" such inclusion likewise may have been wholly declaratory, cognizable without the statute, or it may reflect a legislative purpose either so to declare, or in any event to comprehend such "depreciation" within the category, statutory or declaratory, of "losses." And the Anderson Case gives the clause effect in one or the other or both of these possible ways in respect of securities which have "fallen in worth." But in no aspect does the statute *restrict* the category of deductible "losses," except (1) that they must be actually sustained (2) within the year. Even such restrictions, or conditions, it is confidently believed, are declaratory. Upon no sort of justification was it left open to administrative power, duty, or grace to *define* "losses" or to limit the term to such only respecting which the fact and degree of loss are shown by limited proof—which may or may not be available to the taxpayer, and, if available, may not nor cannot be the surest—in

no event, the *sole*—determiner. In short, there is nothing in the statute which limits, nor empowers the tax administrator to limit, "losses" sustained by a taxpayer in respect of property or property transactions to such as may be "proved" only by a sale at a price which is lower than some prior purchase price, or than some other basis of value which the collector may be willing, upon his own conception of determinative proofs, to recognize—the latter (as in the present case admittedly excessive) alone may prove the "loss." Hence, recurring to an illustration, the taxpaying plaintiff is no more crippled in showing itself to be within the fundamental right of the statute itself than would be one of its shareholders on a bill charging capital "loss" or waste in respect of the Tubbs purchase; than would be a bank examiner, who charged a bank with "impairment" or "loss" of capital on a note and mortgage covering the property which plaintiff might have given to get from it the entire, admittedly "excessive," consideration paid on the transaction in question.

Therefore, without resorting to further illustrative analogies, we repeat that in allowances of "deductions" for "losses sustained" there is no legislative limitation or definition of "losses," much less of the manner or method of determining the fact, or of admeasuring degree, of a particular "loss"; that, when concession is made of a capital disbursement in money "excessive" in respect of property "value" purchased, when it must be found, as it is, that a large disbursement is made, for which little, if any, value was received, the conclusion must be, not merely that the physical property immediately "depreciated" to a figure lower than the disbursement, but that in a legal sense a "loss" was then *sustained.* It may be added that administrative difficulty or greater burden of determining the fact, and, if it be the fact, of a loss, then its just admeasurement cannot at all deny nor disparage the legal right which the statute grants to the taxpayer to assert such "loss"; nor can it delimit his equal right to resort to proofs which competently support both the fact and degree of such loss. So that, in the present case, the plaintiff is entitled to urge, as of a date or a period anterior to any year or years the average of whose incomes under an excise law furnishes the yardstick for measuring *income* or "war profits" law passed in 1918, every fact, pertinently supporting *property values,* thereby to establish the fact of *sustaining a loss,*

at and as of such anterior date or period, and which, as will be noted, was recognized and acquiesced in by the government at the earlier date, in the administration of the excise law. In other words, the facts are now found as the fact and degree of loss sustained in 1909—certainly in 1910.

For this extended discussion, justification or excuse—whether possible, I will not venture to say—will not be offered, save as either may be found in a desire to respond to contentions believed to be fundamentally erroneous; first those dealing with the interpretation of a tax like the one in question, in its recognition (largely declaratory, as I believe) of the taxpayer's right to deduct "losses" or depreciation, in ascertaining net income or profits; secondly, with respect to the range of proof open to a taxpayer to exercise his right and establish his deductible loss or depreciation, even if the right be wholly statutory; that is, if the statute prescribes no limitations either as to the character or degree of loss, recognizes solely the right, then its exercise upon all available and pertinent proofs cannot be denied or disparaged through mere executive limitations; third, with respect to adjudicated cases pressed as authoritative upon these questions.

But plaintiff presses a further consideration, which, already adverted to, is entitled to more specific consideration in the light of the provisions of the 1918 act. 40 Stat. at Large, p. 1088 (Comp. St. §§ 6336⅟₁₆a–6336⅟₁₆p). By section 301 thereof (Comp. St. § 6336⅟₁₆aa) there is levied an additional or "war profits" tax equal to the sum by which 80 per cent. of the amount of "net income" exceeds the amount of "certain other taxes" computed as therein prescribed. The act provides for the determination of credits, cast upon a "pre-war period":

"Sec. 310. That as used in this title the term 'pre-war period' means the calendar years 1911, 1912, and 1913. * * *"

"Sec. 311. (a) That the war profits credit shall consist of the sum of:

"(1) A specific exemption of .$3,000; and

"(2) An amount equal to the *average net income* of the corporation for the pre-war period, plus or minus, as the case may be, ten per centum of the difference between the *average invested capital* for the pre-war period and the invested capital for the taxable year. * * *" (Italics supplied.)

Comp. St. §§ 6336⅟₁₆d, 6336⅟₁₆e.

The act continues:

"Sec. 320. (a) That for the purpose of this title the net income of a corporation shall be ascertained and returned—

"(1) For the calendar years 1911 and 1912 upon the *same basis* and in *the same manner* as provided in *section 38* [supra, of the Corporation Excise act of 1909]. * * *

"(2) For the calendar year 1913 *upon the same basis* and *in the same manner* as provided in section 11 [of the act of 1913]. * * *

"(3) For the *taxable year* upon the same basis and in the same manner as provided for income tax purposes in *Title II of this act*." (Italics supplied.)

Comp. St. § 6336⅟₁₆g.

It would seem elementary that, when this act incorporated these provisions of the Excise Law of 1909, the latter, not the former, on the question before us, defined the rights and liabilities of both government and taxpayer; that the income for each of the "pre-war years" is determinable solely with reference to the limitations both upon the right and power of the government and the corresponding right and limitations on *liability* of the taxpayer, under the 1909 *excise*, not the 1918 *income* tax, acts. The latter—probably nearly every one of the tax laws passed and in the establishment of an enlarged income tax policy—exhibits clearly the trend and accomplishment of legislative purposes, among others (1) to enlarge by definition, "profits," "gains," and the like, as taxable subject-matter, and to curb or restrict by like definition "losses," "depreciation," "expenses," and the like, as offsetting, or deductible, subject-matter in arriving at a "net" result. In dealing with the government's contention in the present case against the deductibility of a "loss" until "sale or other disposition of the property," it is interesting to note that this identical language appears in the 1918 act (perhaps not for the first time), but certainly not in the excise act of 1909. It is found as a *legislative* declaration of "the basis" for ascertaining the "*gain derived* or *loss* sustained from *the sale or other disposition* of property, real, personal or mixed," and significantly, proceeds to fix the bases:

(1) "In the case of property acquired before March 1, 1913, the *fair market price or value of such property* as of that date."

(2) "In the case of property acquired on or after that date, *the cost* thereof; or the *inventory value*, if the *inventory* is made in accordance with section 203."

(3) Dealing with exchanges of property; prescribes *"fair market value."* (Italics supplied.)

[3] But these and kindred formulæ, established by the 1918 or any other income tax act, did not augment the power of the government, nor restrict the right or enlarge the liability of the taxpayer in determining incomes for the years 1911, 1912, or 1913, to measure the excise under the 1909 law. The income of plaintiff had been annually returned, and for the year 1910 the very loss claimed in respect of the Tubbs venture had not only been expressly asserted, but expressly recognized, for that year, and for the succeeding years, until the government—under the 1918 act—attempted to open valuation of property (for 1912) to determine a larger loss *for that year* than was possible to find upon the facts as they had theretofore been rightfully determined. Upon no consideration of the 1918 law was power lodged to value plaintiff's property, or to state its accounts in and prior to 1910. The tax law of 1909 having been administered with respect to the item of value, therefore, "loss" here in question, on its income for the year 1910, the government had no right or power to reopen the matter by claiming, in 1918, that the loss, recognized in 1910, as having then occurred, or then been sustained, need not, in 1918, be recognized *as "sustained"* until 1912. It could not reopen it under the pretext of administering the 1918 law, yet allow the administration of the excise law, which was in fact carried out and apparently forever closed, to stand as an incongruity of no concern either to it or to the taxpayer. But, if from any source not within our view, the government in 1918 could go into this matter, I am confident that no justification can be found, in any law, for taking the $164,000 capital disbursement made in 1909 *as the sole determiner of value* of the whole or part of the Tubbs transaction *down to* the *moment* of *sale of part* of it, in 1912; that in doing so and ignoring (1) the conceded excess of disbursement over "value" in 1909, and (2) the fact then and now existing of the disbursement of 30 per cent. as a "loss," the rights of the taxpayer were arbitrarily disparaged and denied.

Upon these views, the general conclusion is that plaintiff must prevail, and, as the case was tried upon stipulation waiving a jury, counsel for the parties may, if they desire, submit special findings or requests covering the matters of fact and of law.